Clement L. Hirsch v. Commissioner.
Hirsch v. Commissioner
Docket No. 83349.
United States Tax Court
T.C. Memo 1961-256; 1961 Tax Ct. Memo LEXIS 93; 20 T.C.M. (CCH) 1341; T.C.M. (RIA) 61256; September 8, 1961
*93 The Las Vegas Jockey Club was incorporated to succeed the Las Vegas Thoroughbred Racing Association, a bankrupt, in establishing a racing plant in Las Vegas. Petitioner was a stockholder, a bondholder, director, officer and member of the executive committee of the Jockey Club. In 1953 he advanced $20,000 to the Jockey Club when it appeared that the Club was headed for financial and organizational difficulties. He deducted the advancement as a business bad debt on his 1953 income tax return. Held, the advancement was a nonbusiness bad debt within the meaning of section 23(k)(4), Internal Revenue Code of 1939. Held, further, petitioner is not entitled to claim deductions of $2,869.89 as travel and living expenses away from home and $1,000 for attorneys' fees because he has not shown that he was engaged in a trade or business to which said amounts related. Section 23(a)(1)(A), Internal Revenue Code of 1939. Jacob Shearer, Esq., 3363 45th St., Los Angeles, Calif., for the petitioner. Lawrence S. Kartiganer, Esq. and Roger Rhodes, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency *94 in petitioner's income tax of $17,092.12 for the year 1953. The issues are: whether respondent correctly disallowed petitioner's claimed deduction as a bad debt of $20,000 advanced to a corporation in which he was a stockholder, bondholder, officer and director; a deduction of $2,869.89 as travel and entertainment expenses in connection with the corporation; and of $1,000 for legal services in connection with his activities for the corporation. Findings of Fact Some of the facts have been stipulated and they are found accordingly. Petitioner, Clement L. Hirsch, at the time of trial of this case resided at Chatsworth, California. He filed a separate cash basis income tax return for the year 1953 with the district director of internal revenue at Los Angeles, California. The Las Vegas Thoroughbred Racing Association was organized to build a horse racing plant in Las Vegas, Nevada. It was financially unsuccessful and became the subject of a bankruptcy proceeding. The Las Vegas Jockey Club was incorporated under the laws of Nevada in March 1953. It was created as a part of a plan of reorganization in the matter of Las Vegas Thoroughbred Racing Association, a proceeding under Chapter *95 X of the Bankruptcy Act, pending in the District Court of the United States for the District of Nevada. Under the plan the Jockey Club issued $2,000,000 of 6 percent mortgage bonds and $42,500 par value Class A stock. Holdings of bonds and Class A stock were proportionate. One thousand shares of $0.02 par value stock were held for each $1,000 in bonds. In addition, Class B stock was issued to a minority group, consisting of preferred stockholders and bondholders of its predecessor, Racing Association. The plan contemplated that the funds would be used to purchase the real property of Racing Association, to furnish money for amounts due to the United States, the State of Nevada, other Government agencies and creditors, to pay for costs of administration of the proceeding, to complete the racing plant and to provide sufficient capital for operating expenses. The plan was confirmed by the District Court in February 1953. The board of directors of Jockey Club consisted of 15 members including petitioner, Louis Smith and Raymond Roberts. Three of the members of the board, including Roberts, represented the holders of Class B stock. A five-member executive committee of Jockey Club, which *96 included petitioner and Smith, carried on the day-to-day operation of the Club. Smith was elected president and petitioner vice-president of the Jockey Club in March 1953. There was no arrangement for the payment of salaries to the directors or members of the executive committee. Petitioner held about $90,000 in par value Jockey Club mortgage bonds and the accompanying Class A stock. On May 12, 1953, a petition for an order to show cause in the Racing Association proceeding was filed in the District Court by Roberts in which petitioner and other officers and members of the executive committee were charged with mismanagement of the affairs of the Jockey Club. The petition charged, among other things, that Jockey Club funds had been channeled into over-construction of the plant improvements and funds for working capital had been depleted. In connection with such charges Roberts asserted the claim that the court should consider whether the Jockey Club had and should bring a cause of action against its officers and the members of the executive committee by reason of the asserted mismanagement. Hearings on this petition were held before a special master in May and June of 1953. *97 In August or September 1953 the Jockey Club bondholders were requested by Smith to advance to the Club an amount equal to 20 percent of their bondholdings. In response to this request funds totaling $316,200 were advanced by 19 bondholders. Some did not make advances in response to the request. Petitioner advanced $20,000 and Smith $60,000. Before advancing the money petitioner had been told by Smith and by Graf, Smith's attorney (who was also a member of the executive committee), that if money was not raised the members of the executive committee would be subject to liability for mismanagement. Graf advanced no money. In early October 1953 the Jockey Club opened its racing meeting. [1] As a result of poor attendance and the receipt of insufficient funds from the parimutuels the Jockey Club canceled the racing meeting prior to completing the full schedule. Several weeks later a second attempt was made to open the track on a more modest scale. This also failed after several days and thereafter no further racing was conducted. *98 On October 15, 1953 a petition for an order to show cause was filed by Roberts in the Thoroughbred Association proceeding in the District Court. The petition alleged substantially the same matters which the May petition had contained. On October 19, 1953 the District Court, in the matter of the Racing Association, issued an order to show cause why the directors should not be removed, why an operating receiver should not be appointed and related matters. The order directed that a hearing be held on November 2, 1953 and also directed the Jockey Club to show cause why the trustee should not be empowered and directed to investigate the possibility of civil causes of action against the executive committee. It further provided: And pending said hearing you are hereby restrained and enjoined from taking any action authorizing the filing of a voluntary petition in bankruptcy. At a hearing in the Racing Association proceeding on February 11, 1954 in the District Court, the judge presiding stated: "If the order of November 3 prohibited anyone from bankruptcy I would modify that order." The Jockey Club filed a voluntary petition in bankruptcy in the District Court on February 19, 1954. *99 On April 10, 1954 the Jockey Club filed a document entitled "Amended Statement of Affairs" in the matter of the Jockey Club bankruptcy proceeding. Not included in the debts there listed was the $316,200 advanced by petitioner and other bondholders in 1953. Also not included therein were claims by the Racing Association trustee and attorneys and claims of the bankrupt's trustee and attorney. On January 11, 1955 the trustee in bankruptcy received an offer to purchase the racing plant's real property for $2,650,000 plus accrued interest to the date on which the mortgage bonds were to be paid. It was stipulated that the trustee in bankruptcy was to accept in lieu of cash the face value plus accrued interest of any of the Jockey Club's mortgage bonds. The buyer was to pay real property taxes. The offer was accepted by the referee in bankruptcy at the hearing at which it was made. In addition, about $45,000 was received from the sale of personal property. The total amount received from sales of real and personal property was $3,028,369.94. On April 1, 1955 the trustee in bankruptcy filed a statement of claims and an analysis of the funds available for payment of claims and expenses of *100 administration, which statement was expressly made on the assumption that the purchaser of the real property would comply with the terms of his purchase. In said analysis it was determined that the total amount of secured claims, priority claims and expenses of administration amounted to $2,923,142.83 and accordingly there would be available for distribution to unsecured creditors the sum of $105,227.11. Said sum in fact represented the approximate amount which was ultimately available for distribution to unsecured general creditors. In 1956 petitioner was repaid out of the bankruptcy proceedings $5,267.08 on account of his $20,000 advance to the Jockey Club. Petitioner traveled to and from Las Vegas during 1953 in connection with his activities in the Jockey Club. In 1953 petitioner paid a Reno, Nevada, law firm $1,000 to represent him and others in connection with the hearings on the orders to show cause directed to him and to others on October 15, 1953. [2]
*101 In his 1953 income tax return petitioner deducted $20,000 as a "Bad Debt", $2,869.89 for "Travel and Entertainment Expenses" and $1,000 for "Legal Services". The deficiency in question arises from respondent's disallowance of these claimed deductions. Opinion Petitioner argues that the $20,000 advancement to the Jockey Club was a business debt which became worthless in 1953 and that it is deductible under section 23(k)(1) of the Internal Revenue Code of 1939. [3]
Although the question is not entirely free from doubt, we think that petitioner's advancement to the Jockey Club was a loan, not, as *102 respondent contends, a contribution to capital. The advancement provided needed funds to permit the corporation to open its race meeting. Petitioner, although also a shareholder in the Jockey Club, was primarily a bondholder. Under the reorganization plan $2,000,000 in bonds were issued to raise money to meet the creditors' demands against Racing Association and to complete the racing plant. The stock which accompanied the bonds occupied a nominal position in the Jockey Club capital structure: $42,500 worth of $0.02 par value shares amounted to hardly more than qualifying shares. The testimony seems to indicate that the petitioner's and the other advancements were solicited from bondholders as an adjunct to their bondholdings to provide sufficient funds to permit the track to get in financial order so it could open. Then too, the referee in bankruptcy in 1956 paid petitioner in excess of 25 percent of his advancement as an unsecured creditor. However, even though we believe that petitioner should be considered to have loaned money to the Jockey Club, we do not believe the facts of this case support his argument that it was a "business" loan within the intendment of section 23(k)(1). *103 Rather, we think that the record compels the conclusion that it was a "non-business" loan within section 23(k)(4). Petitioner does not argue that he was in the business of making loans to corporations, cf. Phil L. Hudson, 31 T.C. 574, but rather that he was in the trade or business of being an officer and director of Jockey Club and that the loan was proximately related to such trade or business. We will go into the issue as to petitioner being in the trade or business of an officer of the Jockey Club later, but assuming for the purpose of this issue that he was, we cannot agree that there was any relation between his business as an officer and director and his loan to the corporation of a nature which would cause the loan to be incurred in such trade or business. Petitioner argues the loan was made, as he states, "to mitigate charges of mismanagement" or "to alleviate charges of mismanagement" and that the loans were therefore proximately related to his business of being an officer and director of the Jockey Club. This record does not support a finding that the advancement was made to settle the threat of a suit arising from his mismanagement. In the first place, *104 assuming that the show cause actions were tantamount to the threat of a suit for mismanagement, [4] such threats are usually settled by payment of amounts in satisfaction of damages, not by loans. Here, the mismanagement threats were made by Roberts who represented the Class B shareholders (the former bond and stockholders of Racing Association). He testified as petitioner's witness and flatly stated the advancements by the bondholders were not by way of compromise of any claims of mismanagement. He did not learn of the advancements until after they had been made and he immediately expressed his dissatisfaction with that method of raising money. His testimony is corroborated by the fact that after the money was advanced by petitioner and other bondholders, a second petition for an order to show cause was filed and court proceedings were had in October 1953. And indeed petitioner himself, in response to cross-examination testified, "I don't think [the $316,200 advancement] * * * was intended as a settlement of any charges exactly, no." *105 In the second place, it appears that about 19 bondholders made advancements to the corporation similar to petitioner's. Only a few of them were on the board of directors or the executive committee. Petitioner's explanation that they did this out of friendship to him and other directors is not persuasive. Petitioner argues Great Island Holding Corporation, 5 T.C. 150 and William L. Butler, 17 T.C. 675 "control the present case." The facts here do not bring petitioner within the rule of these cases. The cited cases do not involve the issue of loans by the corporate executive to his corporation. They involve the deductibility of payments, admittedly to settle claims for damages for the alleged breach of fiduciary duties. Here no claim for deductibility of a payment is involved and the advancement was not made to settle any mismanagement claim. Petitioner admits on brief that a corporate officer's loan made primarily "to prevent the corporation from going under in order to protect an investment" is related to the corporation's, not the officer's, business. We think such is the case here. In other words, we believe that the record amply demonstrates that *106 the stimulus which impelled the loan arose from petitioner's interest in the corporation as a secured creditor rather than from his officer-director activities. Petitioner points to no theory on which the advancement, cast in this light, is deductible, and we know of none. We hold that petitioner's advance to the Jockey Club constituted a nonbusiness bad debt within the meaning of section 23(k)(4) of the Internal Revenue Code of 1939. Our holding above renders it unnecessary, upon the record presented, to decide the year in which the debt became worthless. Petitioner contends that $2,869.89 which he claims was expended for "travel and living expenses away from home" and $1,000 expended for attorneys' fees for himself and other members of the executive committee are deductible in 1953. Although on brief petitioner does not state under which section of the Internal Revenue Code of 1939 he claims deduction for these items, he does argue that they are business expenses. We assume that petitioner is arguing that section 23(a)(1)(A) controls. That section makes one prerequisite of deduction that the expenses in question be incurred in "carrying on any trade or business." Thus, petitioner *107 has the burden of establishing a trade or business to which the expenses in question relate. He argues that he was in the trade or business of being an officer and director of Jockey Club. This is a question of fact. Frederick A. Purdy, 12 T.C. 888. The facts of this record lead us to conclude petitioner was not in the trade or business of being an officer or director of Jockey Club. Being a corporate executive can constitute a trade or business for purposes of section 23(a)(1)(A). Peoples-Pittsburgh Trust Co. et al., Executor, 21 B.T.A. 588, affirmed 60 F. 2d 187. However, being a corporate executive does not automatically mean that the taxpayer is in that trade or business. The taxpayer's activities as a corporate executive are open to scrutiny under the general tests for determining the existence of a trade or business. The record here shows quite conclusively that petitioner treated his Jockey Club activities as something apart from his ordinary affairs. Business includes "[that] which occupies the time, attention, and labor of men for the purpose of livelihood or profit." Flint v. Stone Tracey Co., 220 U.S. 107, 171. *108 It is "the activity or activities in which a person engages for the purposes of earning a livelihood." Folker v. Johnson, 230 F. 2d 906, 907. There must be the "hope or expectation of making a livelihood or profit" from the efforts devoted to the business activity. Kerns Wright, 31 T.C. 1264, 1268, affirmed 274 F. 2d 883. Measured by any of these tests, petitioner fails. Petitioner testified that when he first became a member of the executive committee "it was discussed * * * that when the track was successful, that the members of the executive committee that were actually going to operate the track would be paid [:] * * * all the members of the executive board would be paid when it was successful." Petitioner testified that he did not receive compensation from the Jockey Club in 1953 and there is no evidence that he ever received any. He further testified that he made no claim for salary in the bankruptcy proceeding. His 1953 tax return reports income from the Victory Packing Co., of which he was president, of $54,936.31 and from Dog Town Packing Co., a partnership, of $27,674. He testified that his work for Victory Packing Co. alone was *109 a "full-time job." We can find in this record nothing to support a finding that petitioner devoted his time, attention and labor to his activities as an officer of the Jockey Club for the purpose of earning a livelihood or making a profit from that activity. Even though the possibility of compensation for his work as an executive was "discussed", there is no indication that it was the expectation of receiving such compensation which led him to act as an officer and director. The more ready inference is that he undertook his executive activities out of an interest in his extensive bondholdings in the Jockey Club. Twelve of the fifteen members of the Jockey Club board of directors were bondholders, as were four of the five members of the executive committee. However, we need not deal in inferences. Petitioner has failed to show that he was in the trade or business of being an officer and director of Jockey Club. We hold that he is not entitled to a deduction for the amounts claimed. Decision will be entered under Rule 50. Footnotes
1. The facts in this sentence are stipulated. Testimony at trial seems to indicate that the abortive meeting began in September on Labor Day. The difference is of no importance except in terms of the chronological sequence of events.↩
2. The facts in this paragraph are stipulated. The dates of the petitions for orders to show cause, May 12 and October 15, appear in our findings above. The only order to show cause in evidence is dated October 19, 1953.↩
3. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; * * *. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a nonbusiness debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts. - * * * The term "non-business debt" means a debt * * * other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. It is to be remembered that the activities of the Jockey Club were under the continuing scrutiny of the Federal court as a part of the plan of reorganization of Racing Association. The show cause actions were only a facet of such proceedings. Query as to the liability which might be developed.↩